UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JDS TECHNOLOGIES, INC.,
a Michigan corporation,

    Plaintiff,

vs.                                                    Case No. 15-10387

EXACQ TECHNOLOGIES,                HON. AVERN COHN

    Defendant.
_____/

**MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**
**(Doc. 16)**

# **TABLE OF CONTENTS**

I.  Introduction                                                           1

II. Background                                                             3

    A.  The JDS Patents in General                                      3

    B.  The Paradigm Claim                                               5

    C.  JDS's Description of the Patents and Invention                   6

III. Motion to Dismiss                                                     9

IV. Analysis                                                               9

    A.  Abstract Idea                                                    10

        1.  Parties' Arguments                                           10

        2.  Discussion                                                   11

    B.  Inventive Concept                                                16

V.  Conclusion                                                             17

I. Introduction

This is a patent case. Plaintiff JDS Technologies, Inc. (JDS) is suing defendant Exacq Technologies, Inc. (Exacq) claiming infringement of two patents: U.S. Patent Nos. 6,891,566 ("the '566 patent") and 8,185,964 ("the '964 patent") (collectively, "the JDS patents"). The JDS patents issued in 2005 and 2012. Both patents are identically titled, "Digital Video System Using Networked Cameras" and relate to software used for video surveillance systems. Each shares a common specification and claim priority directly or indirectly to a U.S. provisional patent application filed in 2000.

According to JDS, the patents are directed at protecting against the unauthorized use of the video surveillance software, i.e. piracy, though the use of a Media Access Control (MAC) address, which is a unique address assigned to each computer. The patented technology uses MAC addresses to control which computers have access to the video surveillance software.

Exacq disputes this characterization of the patented technology, contending that the patents never mention "unauthorized use" or piracy. Exacq instead says that they are "directed to software that provides for the accessing and displaying of camera images." (Doc. 1, Complaint at ¶ 1). Exacq further says that the use of the MAC addresses, which is the "validation" step in the patents, is a generic and conventional way for computers to identify and communicate with other devices and therefore not patent eligible.

Before the Court is JDS's motion to dismiss under Fed. R. Civ. P. 12(b)(6) on the grounds that the asserted claims in each patent are invalid under 35 U.S.C. § 101 in light of the Supreme Court's decision in Alice Corp. Pty. Ltd. v. CLS Bank International,

1

134 S. Ct. 2347 (2014).  Essentially, Exacq says that the patents claim nothing more than an abstract idea—monitoring images from multiple video cameras from a single location—and the use of the MAC addresses as part of the licensing process is not an inventive concept but simply a conventional step in computing.

This motion is part of a growing trend in federal district courts and the Court of Appeals for the Federal Circuit addressing a section 101 challenge to a software patent based on the Supreme Court's decision in Alice.

The motion is fully briefed.  The motion papers are voluminous and comprise the following:

    Doc. 16 - Exacq's Motion and Brief
    Doc. 20 - JDS's Response and Brief
    Doc. 22 - Exacq's Reply
    Doc. 28 - JDS's Surreply
    Doc. 29 - Exacq's Notice of Supplemental Authority
    Doc. 31 - Exacq's Notice of Pertinent Authorities
    Doc. 32 - JDS's Supplemental Submission[1]
    Doc. 34 - Exacq's Response to JDS's Supplemental Submission
    Doc. 37 - JDS's Notice of Filing Declaration of C. Douglas Locke, Ph.D.
    Doc. 42 - JDS's Supplemental Submission on Patent Eligibility[2]
    Doc. 43 - Exacq's Response to JDS's Second Supplemental Brief
    Doc. 44 - Exacq's Notice of Supplemental Authority
    Doc. 45 - Exacq's Notice of Supplemental Authority
    Doc. 46 - Exacq's Notice of Inter Partes Review[3]
    Doc. 47 - JDS's Notice of Supplemental Authority
    Doc. 48 - Exacq's Response to JDS's Notice of Supplemental Authority

---

[1]Docs. 32, 34, and 37 were filed following a tutorial.  Docs. 36 and 39 contain JDS's tutorial materials.  Doc. 40 contains Exacq's tutorial materials.

[2]Docs. 42-45 were filed following oral argument.

[3]Exacq filed petitions for inter partes review (IPR) challenging the validity of certain claims in the '566 and '964 patents.  Because IPR petitions do not raise section 101 patent eligibility issues, the Court is going forward with the motion to dismiss.  Additionally, the USPTO has not, to date, agreed to hear the IPR petitions.

II. Background

A. The JDS Patents in General

As noted above, the complaint describes the JDS patents as directed to a relatively basic concept: "the accessing and displaying of camera images." (Doc. 1, Complaint at ¶ 12). In looking at the text of the JDS patents, the first sentence of the specification states that the

> invention relates to systems for accessing, recording, and displaying camera images from any number of remotely located cameras and, **more particularly**, to such systems that provide access to images from one or more remote cameras over a public or private computer network.

(Col. 1 ll. 11-15 (emphasis added)).

The "Background of the Invention" section of the specification acknowledges that analog and digital video surveillance systems already exist that allowed users to access and display images from multiple cameras in a single viewing location. (Col. 1 ll. 22-41 (discussing analog-only system using video cables, a monitor/TV, and a multiplexer to allow "multiple cameras to be hooked to a single recording/view device"); Col. 1 ll. 42-62 (discussing digital systems using similar technologies for viewing multiple cameras from one location)) According to the specification, these pre-existing analog and digital systems were problematic because they were expensive, did not necessarily allow for remote viewing, and required special configurations and skilled technicians to implement and maintain. (Col. 1 ll. 35-40 (analog-only systems); Col. 1 ll. 55-62 (digital systems)).

In addition to these systems, the specification also says that "[t]here now exists commercially available networkable cameras that can be accessed over networks

3

running TCP/IP,[4] including both LAN[5]s and global networks such as the Internet." (Col. 1 ll. 63-66)  "Ethernet-based digital video servers are now common that are small, autonomous, and usually contain a web-based configuration utility, as well as administration software." (Col. 1 l. 66 – col. 2 l. 2)  "[T]he video servers (whether integrated in as part of a camera server or as a standalone unit [which uses a traditional analog camera]) can be connected to the Ethernet-based networks commonly used in businesses and other computer enabled sites." (Col. 2 ll. 17-21)  The specification identifies two existing, commercially-available types of "video servers."  "One is a camera server that is a complete product containing both a camera and a web server with an Ethernet port." (Col. 2 ll. 10-12)  "The other is a component based video server with inputs for one or more analog video feeds, which the user can connect to conventional camera PAL or NTSC video feeds." (Col. 2 ll. 12-15)

According to the specification, "[t]hese video servers can be connected to these network segments and are fully compatible with existing data on these networks." (Col. 2 ll. 21-23)  "The video data can be received by standard PC computers which require no special hardware other than an Ethernet connection.  The cameras can be easily configured by a novice user who has very basic experience with the Internet."  (Col. 2 ll. 23-27)

Having identified these pre-existing systems and equipment, the JDS patents

---

[4]TCP/IP is an acronym for Transmission Control Protocol/Internet Protocol, "TCP/IP is the suite of communications protocols used to connect hosts on the Internet. See http://www.webopedia.com/TERM/T/TCP_IP.html (last visited May 9, 2016).

[5]A LAN is commonly known as Local Access Network.

describe the invention as follows:

> [T]here is provided a digital video system which includes a client computer, one or more video servers accessible by the client computer over a network, and a plurality of cameras connected to the video servers. The one or more video servers provide an interface between the cameras and client computer, with images from the cameras being accessed by the video servers and then sent to the client computer upon request by the client computer. The client computer provides a user interface display on the computer that includes a display window for each of the cameras accessed over the network and that displays in each of the display windows an image received from the camera associated with that display window.

(Col. 3, ll. 20-33).

The devices that perform these functions are computers, cameras, and networking equipment. For example, "[t]he cameras . . . that are connected to the video servers . . . can be industry PAL or NTSC video cameras." (Col. 5 ll. 19-21) And the "[c]lient computer . . . can be a conventional personal computer having an Intel™ or compatible CPU running a Windows™ operating system and including a network interface card . . . for connecting to the 10/100 Mb Ethernet network . . . that uses the TCP/IP network protocol." (Col. 5, 22-26)

Finally, the JDS patents identify six different potential video and camera servers by way of example only, noting that "other" servers may also be used. (Col. 5 ll. 14-20, fig. 1)  In other words, the "invention" in the JDS patents takes cameras, connects them to servers on a network, and then accesses those cameras on a computer.  Images from the generic cameras are then output to an unspecified, generic display.

## B.  The Paradigm Claim

JDS claims that Exacq infringes Claims 1 and 49 of the '566 patent and Claim 1 of the '964 patent.  (Doc. 1 at ¶¶ 33, 55, 82, 93, 101, 134, 142, 144, 153)  No other

5

patent claims are claimed to be infringed.

Claim 1 of the '566 patent is the designated representative/paradigm claim. It reads:

> A computer readable medium for use by a computer in providing an interface to multiple cameras via one or more video servers accessible to the computer via a network, comprising
>
> a digital storage device;
>
> a user interface program stored on said digital storage device in computer readable form, said program being operable upon execution by the computer to access server data uniquely identifying each video server and to attempt access to the video servers over the network, said program also being operable to obtain from each of the accessible video servers a hardware address stored in the video server;
>
> wherein said program is further operable to validate the hardware addresses received from the video servers using the server data and, for those video servers having a valid hardware address, said program is operable to generate a user interface display on the computer that includes a display window for each of the cameras accessed via the validated servers over the network and to display in each of the display windows an image received from the camera associated with that display window.

(Col. 21 ll. 6-24).

### C.  JDS's Description of the Patents and the Invention

In its papers, JDS describes the background leading to the patents as well as what it says make the patents cover unique subject matter, i.e. patentable. The background begins with Joseph Marchese, the founder of JDS and inventor of the patents-in-suit. JDS says that Marchese, as software engineer, knows that piracy of the software itself is an important issue. JDS goes on to say that Marchese has personal experience with software piracy when he was a trade show where he learned that his software was being sold by someone else who previously had access to the software

and simply copied it. JDS says that Marchese sought a better solution to software piracy than those available at the time. JDS describes Marchese's development of the process leading to the JDS patents as follows:

In 1999, Marchese developed software for use in the surveillance industry. Before the software was completed, Marchese implemented a unique anti-piracy solution. Instead of the software being unprotected from copying, or using "dongles"[6] as taught by the prior art, Marchese, says JDS, went in a completely different direction. Unlike most persons that developed solutions for software piracy, Marchese appreciated the benefits that could come from software that could be freely shared with clients or potential clients. Such persons could install the software on various devices without restriction and enjoy access to their surveillance system from anywhere. But, such a benefit could not be achieved with the existing software piracy solutions. To solve this problem and to provide an improved anti-piracy solution, Marchese developed de-centralized MAC address licensing to prevent piracy and abuse of his video surveillance software.

As explained in the patents-in-suit, embodiments of the invention rely on the software extracting unique numbers, MAC addresses, "from protected areas" of camera devices and servers that are remotely located from the software. These numbers, which are only ascertained through "parsing and formatting," are then tested against

---

[6] A dongle is a small piece of hardware that attaches to a computer, TV, or other electronic device in order to enable additional functions such as copy protection, audio, video, games, data, or other services. These services are available only when the dongle is attached. See https://en.wikipedia.org/wiki/Dongle (Last visited Mar. 29, 2016).

known values to validate or approve only certain devices for use with the particular software.  The result is an anti-piracy or licensing technology that is de-centralized and permits software to be freely distributed, but not abused.  This aspect, says JDS, was revolutionary and is the subject of many of the claims of the patents in suit.

In short, JDS says that the patents cover a method for licensing software which uses the MAC addresses.  Claim 1, with the critical language identified by JDS as describing this process is highlighted below:

> 1. A computer readable medium for use by a computer in providing an interface to multiple cameras via one or more video servers accessible to the computer via a network, comprising:
>
> a digital storage device;
>
> a user interface program stored on said digital storage device in computer readable form, said program being operable upon execution by the computer **to access server data uniquely identifying each video server** and to attempt access to the video servers over the network, **said program also being operable to obtain from each of the accessible video servers a hardware address stored in the video server;**
>
> wherein said program is further operable to **validate the hardware addresses received from the video servers using the server data and, for those video servers having valid hardware address**, said program is operable to generate a user interface display on the computer that includes a display window for each of the cameras accessed via the validated servers over the network and to display in each of the display windows an image received from the camera associated with that display window.

According to JDS, the advancements in the highlighted claim language above are hardware-focused and had not been performed before.  JDS says that its de-centralized licensing or anti-piracy solution, through the use of a MAC address, was not known, was not considered, and was not used by any of the multi-national companies in the surveillance software industry.  As such, JDS maintains that the patents cover

patentable subject matter under section 101.

### III.  Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007). See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Id. at 678 (internal quotation marks and citation omitted).

### IV.  Analysis

Exacq says that the complaint should be dismissed because the JDS patents do not cover patentable subject matter. As such, the complaint fails to state a plausible claim for infringement.

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore...." Section 101 is limited, however, and does not cover "laws of nature, natural phenomena, and abstract ideas." Alice, 134 S.Ct. at 2354. In "applying the § 101 exception, we must distinguish between patents that claim the 'building block[s]' of human ingenuity and those that integrate the building blocks into something more." Id. (citing Mayo Collaborative Services, v. Prometheus

Laboratories, Inc., 132 S.Ct. 1289, 1303 (2012)).

In Alice, the Supreme Court employed a two-part test "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." Id. at 2355.  First, a court must determine "whether the claims at issue are directed at a patent-ineligible concept."  If the claims are so construed, the court must proceed to step two, which involves a determination as to whether the patent contains an "inventive concept," which is described as "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." Id. (Internal citations and quotations omitted).

### A.  Abstract Idea

Generally, this prong addresses whether the patent is directed to an "abstract" idea because there is a longstanding rule that "an idea itself is not patentable." Id. (Citations and quotations omitted).

#### 1.  Parties' Arguments

Exacq says that the patents are drawn to an abstract idea—"the principle of combining images from multiples cameras in a single location."  Exacq also cites to multiple cases involving software patents where courts have held what it says are similar concepts to be abstract and therefore unpatenable.

Exacq says that the patents-in-suit attempt to cover "the abstract principle of monitoring images from multiple video cameras from a single location – a concept as old as video surveillance itself."

JDS disputes this characterization and says that the claims of the patents-in-suit

are directed to a technological solution to a technological problem – software piracy. The claimed solution is necessarily rooted in computer technology, and its purpose is to overcome a problem that specifically arises with computer software.

According to JDS, "monitoring images from multiple video cameras from a single location" is not an abstract business practice; it can only be accomplished by specific technology. Moreover, JDS says that the claims are not directed to "monitoring images from multiple video cameras from a single location" as argued by Exacq. The claimed inventions described in JDS's patents take a concrete, tangible form – a video management system that queries external devices (computers) for protected information stored in memory (the MAC address) which is used for anti-piracy purposes, i.e. to protect unlawful or unapproved dissemination of software that is located remotely.

### 2.  Discussion

The case law says that "[f]irst, the court must identify whether a claim is directed to an abstract idea. To do this, the court must identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract." California Inst. of Tech. v. Hughes Commc'ns Inc., 2014 WL 5661290, at *13 (C.D. Cal. Nov. 3, 2014). Identifying an abstract idea is no easy matter.

"At some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.' Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." Alice Corp. Pty. v. CLS Bank Int'l, 134 S. Ct. 2347, 2354 (2014). Any invention can be over-generalized in an effort to characterize it as "abstract." "Abstract" ideas have included: (1)

11

intermediated settlement, Alice, 134 S. Ct. at 2359; (2) creating a transaction performance guaranty, buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014); (3) generating insurance-policy-related tasks, Accenture Global Servs., BmgH v. Guidewire Software, Inc., 728 F.3d 1336, 1344-45 (Fed. Cir. 2013); (4) managing a stable-value protected life insurance policy, Bancorp Servs., LLC v. Sun Life Assur. Co. of Canada, 687 F.3d 1266, 1278 (Fed. Cir. 2012); and (5) using advertising as a currency, Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 715-16 (Fed. Cir. 2014). The Federal Circuit has characterized these "abstract" ideas as simple performance of a business practice, one that can and was performed by "human thought alone." CyberSource Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1373 (Fed. Cir. 2011); DDR Holdings, LLC v. Hotels.com, 773 F.3d 1245, 1256 (Fed. Cir. 2014).

In Intellectual Ventures I LLC v. Mfrs. & Traders Trust Co., 2014 WL 7215193 (D. Del. Dec. 18, 2014), a case cited by Exacq, the patent covered digital images like the JDS Patents. The court held that none of the method claims at issue were necessarily tied to any particular structure. The claims recited "scanning" hard copy images, but only for the purpose of grouping the images by "categories." Id. at *10. The court therefore concluded that such a grouping by category is certainly something that can be performed in the human mind and therefore the patent was abstract.

The JDS patents are different from the patent in Intellectual Ventures. JDS is correct in saying that querying external camera devices to extract an embedded unique identifier (the MAC address) and then validating the unique identifier for software licensing purposes is not something a human mind is capable of doing. These steps are necessarily tied to the video devices being validated and system created by their

addition. Here, up to the time of the invention, no one queried digital cameras and video servers for an embedded code (the MAC address) for the purpose of restricting access and protecting the software on a different device. The technological solution presented is inexorably tied to computer technology and prevents abuse by controlling when and how external devices are allowed to operate within a video surveillance system that includes software, creating an effective and desired anti-piracy solution for the software. Thus, the JDS patents are not abstract.

Exacq also cites in support In re TLI Commc'ns LLC Patent Litig., 2015 WL 627858 at *8 (E.D. Va. Feb. 6, 2015) which analyzed another patent that involved "taking, organizing, classifying, and storing photographs." The court held that the patent claims were directed to an abstract idea since they "describe[ ] a scheme or concept not tied to a particular concrete application." Id. at *8.

Here, however, the JDS patents are directed to a particular concrete application. As described above, the JDS patents use device-based access control to prevent unauthorized use of the surveillance software, while allowing unlimited copying and installing of that same software. Moreover, the claims at issue do not cover a "fundamental practice" previously practiced in video surveillance or otherwise. The court in TLI additionally held that the claims at issue were abstract because they covered "common practice that long-predates computers, as persons have taken, organized, classified, and stored photographs for more than a century without the aid of computers." Id. at *8. Thus, TLI does not support a finding that the JDS patents are abstract.

While Exacq argues that the "principle" of the patents-in-suit is "as old as video

surveillance itself," it does not address the claim language whatsoever. It also does not address access control features, i.e. the use of the MAC address, that are rooted in computer technology in order to overcome a problem that specifically arose with the growth of IP camera technology. As explained in DDR Holdings, LLC v. Hotels.com, 773 F.3d 1245, 1257 (Fed. Cir. 2014), the "claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks," and therefore, is not abstract.

The claims of the '566 Patent are directed to a video surveillance system, complete with computers, a network, and a plurality of video servers and cameras. These are particular machines, not generic computers. The claims do not embody a mental process or an abstract idea. And, an abstract idea cannot be found simply because Exacq points to prior art Hollywood movies that show technological systems. Exacq's reliance on movies is an attempt to oversimplify the patented technology. There is no mental process (or other ineligible concept) that permits viewing video images at a central location. The claimed invention, as described by JDS, is not abstract.

Recent authority supports this conclusion. In Enfish, LLC v. Microsoft Corp., No. 2015-1244, 2016 WL 2756255 (Fed. Cir. May 12, 2016), the Federal Circuit applied—and clarified—the first step of the Alice analysis. There the the Federal Circuit made clear that not all claims directed to software are per se abstract ideas under step one of the Alice analysis and explained that a claim is patentable under 35 U.S.C. § 101—in accordance with step one of Alice—when it is "directed to a specific implementation of a solution to a problem in the software arts." The Federal Circuit

14

explained:

> We do not read <u>Alice</u> to broadly hold that all improvements in computer-related technology are inherently abstract and, therefore, must be considered at step two. Indeed, some improvements in computer-related technology when appropriately claimed are undoubtedly not abstract, such as a chip architecture, an LED display, and the like. Nor do we think that claims directed to software, as opposed to hardware, are inherently abstract and therefore only properly analyzed at the second step of the <u>Alice</u> analysis. Software can make non-abstract improvements to computer technology just as hardware improvements can, and sometimes the improvements can be accomplished through either route. We thus see no reason to conclude that all claims directed to improvements in computer-related technology, including those directed to software, are abstract and necessarily analyzed at the second step of <u>Alice</u>, nor do we believe that <u>Alice</u> so directs. **Therefore, we find it relevant to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea**, even at the first step of the <u>Alice</u> analysis.
>
> For that reason, the first step in the <u>Alice</u> inquiry in this case asks whether the focus of the claims is on the specific asserted improvement in computer capabilities (i.e., the self-referential table for a computer database) or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool. As noted infra, in <u>Bilski</u> and <u>Alice</u> and virtually all of the computer-related § 101 cases we have issued in light of those Supreme Court decisions, it was clear that the claims were of the latter type requiring that the analysis proceed to the second step of the <u>Alice</u> inquiry, which asks if nevertheless there is some inventive concept in the application of the abstract idea. <u>See Alice</u>, 134 S.Ct. at 2355, 2357–59. In this case, however, the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity.

<u>Enfish, LLC v. Microsoft Corp.</u>, No. 2015-1244, 2016 WL 2756255, at *4-5 (Fed. Cir. May 12, 2016) (emphasis added).

As explained throughout the writings in this case, the paradigm claim (claim 1 of the '566 Patent) is directed to a specific process in which a user interface program obtains the MAC addresses of peripheral devices and uses them to enable or disable the display of video. This specific process "enables the software [on another device] to

15

be licensed on a per-camera or per-server basis and can be used to prevent access to any cameras or servers for which the user is not licensed." (Doc. 1-6, '566 Patent at 6:54-56.). Paradigm claim 1 of the '566 patent identifies and claims a process that uses a "hardware address obtained from an accessible video server" to validate whether to permit particular software on a computer to display an image from that server. This specific process was not done before. This claimed process also provides an efficient solution to software licensing – to avoid the problem associated with piracy – within particular computer network environments unique to video surveillance systems. The claims describe an improvement in computer technology. As such, the JDS patents are not directed to an abstract idea.

Application of step one of the Alice analysis to claim 1 of the '566 Patent results in a finding that the claimed subject matter is not abstract. Therefore, the JDS patents are not invalid § 101.

### B. Inventive Concept

In step two in the Alice analysis, the Supreme Court made clear that a claim directed to an abstract idea does not move into section 101 eligibility territory by "merely requir[ing] generic computer implementation." Alice, 134 S.Ct. at 2357. The Court relied on Mayo for the proposition that " '[s]imply appending conventional steps, specified at a high level of generality,' was not 'enough' to supply an ' "inventive concept." ' " Id. (quoting Mayo, 132 S.Ct. at 1300, 1297, 1294). Neither "attempting to limit the use of [the idea] to a particular technological environment" nor a "wholly generic computer implementation" is sufficient. Id. at 2358 (internal quotation marks omitted).

Because the Court has found that the JDS patents are not abstract, it is not

16

necessary to consider step two, i.e. an abstract idea being nevertheless patenable if it contains an inventive concept. The Court will only briefly comment that Exacq's arguments as to an inventive concept appear more appropriately directed to an obviousness challenge.

V.  Conclusion

Overall, the JDS patents are not abstract under step one of the Alice analysis. As such, they cover patentable subject matter under § 101. Exacq's motion is DENIED. The Clerk shall schedule a status conference with the parties to chart the future course of the case.

SO ORDERED.

**CODA**

There is little doubt that Alice has changed the patent landscape and courts will continue to grapple with the decision and its impact, particularly on software and business method patents. See http://www.abajournal.com/magazine/article/ business_method_and_software_patents_may_go_through_the_looking_glass_after. (Last visited May 25, 2016). Recent Federal Circuit decisions illustrate the difficulties in applying Alice. Compare Becton Dickinson and Co. v. Baxter Int'l, Inc., 15-1918, 2016 WL 2620564 (Fed. Cir. May 9, 2016) (summary affirmance of district court's decision

invalidating a remote pharmacy-monitoring patent as ) with <u>Enfish LLC v. Microsoft Corp.</u>, 15-1244, 2016 WL 2756255, *5 (Fed. Cir. May 12, 2016) (discussed above).

        <u>S/Avern Cohn</u>
        AVERN COHN
        UNITED STATES DISTRICT JUDGE

Dated: June 7, 2016
      Detroit, Michigan